1    DAVID R. EBERHART (S.B. #195474)
     deberhart@omm.com
2    SHARON M. BUNZEL (S.B. #181609)
     sbunzel@omm.com
3    ANDREW M. LEVAD (S.B. #313610)
     alevad@omm.com
4    O'MELVENY & MYERS LLP
     Two Embarcadero Center
5    28th Floor
     San Francisco, California 94111-3823
6    Telephone:    +1 415 984 8700
     Facsimile:    +1 415 984 8701
7

8    Attorneys for Plaintiff
     APPLE INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>            Plaintiff,<br><br>    v.<br><br>SIMON LANCASTER, an individual,<br><br>            Defendant. | Case No.<br><br>**COMPLAINT**<br><br>1. VIOLATIONS OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, *ET SEQ.*<br>2. VIOLATIONS OF THE CALIFORNIA UNIFORM TRADE SECRETS ACT, CALIFORNIA CIVIL CODE § 3426, *ET SEQ.*<br>3. BREACH OF WRITTEN CONTRACT<br><br>JURY TRIAL DEMAND |

1

**<u>INTRODUCTION</u>**

2      1.      Plaintiff Apple Inc. ("Apple") brings this action to stop the misappropriation of

3   Apple's trade secrets by its former employee Simon Lancaster.

4      2.      Despite over a decade of employment at Apple, Lancaster abused his position and

5   trust within the company to systematically disseminate Apple's sensitive trade secret information

6   in an effort to obtain personal benefits. He used his seniority to gain access to internal meetings

7   and documents outside the scope of his job's responsibilities containing Apple's trade secrets, and

8   he provided these trade secrets to his outside media correspondent ("Correspondent"). The

9   Correspondent then published the stolen trade secrets in articles, citing a "source" at Apple. On

10  multiple occasions, Lancaster proposed that the Correspondent give benefits to Lancaster in

11  exchange for Apple's trade secrets. For example, Lancaster proposed that the Correspondent

12  provide favorable coverage of a startup company in which Lancaster was an investor as a quid

13  pro quo. Lancaster even recruited the Correspondent to serve as his personal investigator. In one

14  instance, Lancaster requested that the Correspondent explore a rumor that could prove harmful to

15  a company in which Lancaster had invested.

16     3.      Lancaster's role as the Correspondent's "source" deepened even after he

17  announced his resignation from his role at Apple. Indeed, Apple's internal investigation of the

18  Apple-owned devices provided to Lancaster as part of his employment shows that after Lancaster

19  announced his resignation, he communicated with the Correspondent regarding specific Apple

20  trade secrets sought by the Correspondent and took specific steps to obtain additional Apple trade

21  secrets.

22     4.      The trade secrets Lancaster stole and sent to the Correspondent for publication

23  included details of unreleased Apple hardware products, unannounced feature changes to existing

24  hardware products, and future product announcements, all of which Apple guards closely.

25  Apple's product teams—innovators, designers, and builders—work in complete secrecy, often for

26  many years, and at significant personal burden, all to surprise and delight Apple's customers with

27  their creations. The deceitful and indefensible release of these product details enabled by

28

COMPLAINT

Lancaster's misappropriation has undermined the morale of the teams that worked on the products and features in question.

5.      Lancaster's misappropriation also disadvantages Apple with respect to its competitors. With access to valuable Apple information, Apple's competitors can anticipate Apple's future course of action and attempt to degrade Apple's hard-won position as a company at the forefront of innovation.

6.      Further, forensic review of the devices Apple provided to Lancaster for his work at Apple shows Lancaster and the Correspondent coordinated to pilfer specific documents and product information from Apple. On numerous occasions, the Correspondent had requested Lancaster obtain specific Apple trade secret documents and information. On multiple occasions, Lancaster then sent the Correspondent certain of the requested confidential materials using Apple-owned devices. On other occasions, Lancaster met with the Correspondent in person to provide them with the requested confidential Apple information. The full extent of their conspiracy is presently unknown; however, Apple's investigation is ongoing.

7.      After Lancaster's resignation, he began working at a company that served as a vendor for Apple under a vendor service agreement. Portions of the trade secret information Lancaster misappropriated relate directly to his role at his new employer, and it is likely Lancaster's misuse of Apple's trade secrets continues to this day. In fact, on his last day at Apple, Lancaster downloaded a substantial number of confidential Apple documents from Apple's corporate network onto his personal computer that would benefit his new company.

8.      Lancaster's misconduct constitutes trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*; trade secret misappropriation under California's Uniform Trade Secrets Act (Cal. Civ. Code § 3246, *et seq.*); and a breach of his contractual obligations to Apple. Apple seeks injunctive relief, damages, and other appropriate relief to stop Lancaster's misappropriation, disclosure, and potential use of Apple's confidential and trade secret materials.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE PARTIES**

9.      Apple is a corporation organized and existing under the laws of the State of California. Apple's headquarters and principal place of business is located at One Apple Park Way, Cupertino, California 95014.

10.      Lancaster is United States citizen whose primary residence is 4833 Kingridge Dr., San Jose, California 95124.

**JURISDICTION AND VENUE**

11.      This Court has original jurisdiction over this action under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Apple's related claims for relief under California law pursuant to 28 U.S.C. § 1367(a). Further, Lancaster's Confidentiality and Intellectual Property Agreement with Apple provides for exclusive venue in Santa Clara County, California and provides Lancaster's consent to personal jurisdiction in Santa Clara County, California.

12.      Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) and 1391(c)(3) because a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this judicial district.

**INTRADISTRICT ASSIGNMENT**

13.      Assignment to the San Jose Division is proper under Local Rule 3-2(c) and (e) because a substantial part of the events or omissions that gave rise to Apple's claim occurred in Santa Clara County, California. Apple's corporate headquarters is located in Santa Clara County, California, and Lancaster's wrongful actions were specifically and purposefully directed at Apple and intended to affect Apple in Santa Clara County, California, as discussed in detail below.

**APPLE'S TRADE SECRET INFORMATION**

14.      Apple is engaged in the development of new computer hardware and software, including the development of novel hardware products and improvements to its existing line of products. Apple's research and development activities related to these products are closely guarded secrets that are not publicly revealed, if at all, until Apple releases those products or issues official statements about them.

COMPLAINT

15.     As with all its unannounced products, Apple's research and development is conducted under rigorous conditions to maintain the secrecy of those activities and the products themselves. Apple carefully controls all information relating to these projects. The Apple teams working on these products expend substantial time and energy to ensure that the process remains secret. Further, those teams often spend multiple years working on secret products that they cannot discuss outside work in light of the required secrecy.

16.     Apple has made substantial investments in developing proprietary technology in support of its novel products and updated generations of its existing products. Apple protects the details concerning this technology—including but not limited to schematics, software code, project plans, algorithms, and hardware—from disclosure to the public and to Apple's competitors, including persons who can obtain economic value from the use or disclosure of this technology.

17.     Maintaining this information as a trade secret is essential to Apple's ability to compete in the computer hardware and software markets. These fields are characterized by rapid technological advances and intense competition. If an Apple competitor were to obtain details about Apple's technology or related commercial information, that competitor could significantly harm Apple by using Apple's own technology, know-how, and other details about these products to compete directly with Apple without having to spend the capital and/or time that Apple invested in developing such technologies.

18.     In addition to these technology secrets, Apple also possesses information about unannounced novel products and updated generations of existing products that Apple is developing and may release. This information is not accessible to the public or to persons who can obtain economic value from its use or disclosure. Even within Apple, such knowledge is shared only on a need-to-know basis; accordingly, this information is also not accessible to Apple employees other than those working on the products or who otherwise have a legitimate need to know.

19.     If Apple's competitors obtain access to Apple's unannounced product information, those competitors could also benefit significantly from the knowledge gained through that access

COMPLAINT

1    by directing their product development and marketing efforts to frustrate Apple's plans. This

2    strategic advantage to Apple's competitors could, in turn, severely harm Apple.

3        20.    Apple also makes significant investments in advertising and promotional activities

4    surrounding the launch of a new product. Unauthorized disclosures of unannounced products

5    cause Apple to lose control over the timing and nature of potential product releases. Unauthorized

6    disclosures diminish the interest of both the mainstream and trade media in the launch of a new

7    product. Such disclosures may also dampen customer demand for current products. Thus, Apple

8    maintains and protects such information as a trade secret.

9        21.    The information misappropriated by Lancaster comprises information about Apple

10   technology, information about Apple's unannounced products, and confidential Apple

11   documentation. All of this material comprises Apple trade secrets. In this Complaint, Apple will

12   refer to this information collectively as "Secret Apple Information" or "SAI."

13       **APPLE'S REASONABLE MEASURES TO PROTECT ITS TRADE SECRET SAI**

14       22.    Apple takes all reasonable steps to maintain the confidentiality of its SAI. Apple

15   has established trade secret policies for all its employees, maintains physical security in all its

16   buildings, monitors computer access, and requires all employees to execute strict confidentiality

17   agreements. Apple limits access to SAI to employees and contractors who have a demonstrable

18   need to know such information and have signed confidentiality agreements with Apple.

19       23.    When hired, all Apple employees are required to agree to and sign a

20   Confidentiality and Intellectual Property Agreement ("IPA"). Lancaster signed a copy of the IPA

21   on May 6, 2008; a copy of that document is attached as **Exhibit A**.

22       24.    The IPA requires employees to protect Apple's "Proprietary Information."

23   "Proprietary Information," as defined by the IPA, includes but is not limited to SAI, as defined

24   herein. The IPA informs employees that "Proprietary Information" includes "any information of a

25   confidential, proprietary and secret nature that may be disclosed to you or otherwise learned by

26   you in the course of your employment at Apple, including but not limited to any confidential

27   information of third parties disclosed to Apple." The IPA specifically provides the following

28   examples of "Proprietary Information": "information and material relating to past, present or

future Inventions, marketing plans, manufacturing and product plans, technical specifications, hardware designs and prototypes, business strategies, financial information, and forecasts, personnel information, and customer lists."

25.     Among other things, the IPA requires employees to "keep all Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple." The IPA also provides: "You agree that during your employment by Apple, you will not plan or engage in any other employment, occupations, consulting, or other business activities or commitments competitive with or directly related to Apple's business or products, or to its actual or demonstrably anticipated research or development, nor will you engage in any other activities that conflict with any employment obligations to Apple." When employees leave Apple, the IPA requires that they return to Apple all materials pertaining to their work at Apple: "Upon termination of employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof, whether on paper or any other medium, containing any Proprietary Information."

26.     Even among its employees, Apple limits the access to multiple projects that were the subject of Lancaster's misappropriations. No one may receive or access information about any of these projects, including SAI, without being "disclosed" on the project. Apple strictly controls who is disclosed and only permits individuals with a demonstrated business need to be disclosed. An employee who is not disclosed on one of these projects can only become disclosed if an Apple employee who is already disclosed "sponsors" the non-disclosed employee for disclosure. The sponsoring employee must submit a disclosure request on behalf of the applicant for disclosure. The disclosure request must include a business justification for the applicant's disclosure. A separate Apple employee then reviews the disclosure request and approves or denies it. Apple uses an internal software tool to manage requests for disclosure and maintains a record of all disclosures.

COMPLAINT

27.     Apple also trains its employees on its policies for the treatment of confidential information, including SAI. Apple requires all its employees to take a "Business Conduct" course regularly. In the Business Conduct course, Apple informs its employees that they must keep confidential information, including but not limited to SAI, strictly confidential. Lancaster took this Business Conduct course every year during his employment with Apple.

28.     Apple also requires all employees disclosed on the projects about which Lancaster misappropriated SAI to attend security trainings on maintaining the confidentiality of these projects and SAI. At these trainings, Apple instructs its employees to keep the nature and details of these projects, as well as all SAI, confidential. Apple further instructs its employees that Apple policies prohibit intentional or unintentional leaks of information about these projects to persons who have not been disclosed. These trainings reiterate Apple's policy that individuals who are not disclosed on these projects may not access or be given access to SAI, and, at these trainings, employees are informed that the prohibition on sharing information about the projects, including SAI, extends to family members of Apple employees. At these trainings, Apple also informs employees that Apple's policies prohibit employees from storing IP, including SAI, on devices over which they do not have personal control and that Apple requires that employees store and transmit project documents and SAI using secure mechanisms. Lancaster attended one of these confidentiality trainings on April 10, 2014.

29.     Apple also takes measures to ensure that contractors and vendors protect SAI. Apple provides SAI to its contractors and vendors only on a need-to-know basis. To obtain access to SAI, contractors and vendors must execute contracts obligating them to keep SAI strictly confidential.

30.     Apple secures all its computer networks behind a firewall. Persons outside of Apple cannot access Apple's computers without Apple's authorization.

31.     Apple also protects SAI through other electronic security measures, including but not limited to ensuring that networks hosting SAI are encrypted, require passwords, and require dual-factor authentication for access. Devices such as computers, tablets, and mobile phones

provided to employees are also encrypted, password-protected, and subject to other security measures.

32.     Apple also employs locks, security cameras, guards, and other measures to control access to its physical facilities, including facilities where SAI is located. All doors leading into facilities where Apple maintains SAI are locked at all times. To gain access to Apple's facilities, persons must have keycards issued by Apple that include their photographs. Only Apple employees, temporary employees, and eligible vendors, associates, and contractors receive keycards. Any person who does not have a keycard must be escorted by an Apple employee while within Apple's facilities.

33.     Due to Apple's security measures, Apple's trade secret SAI is not available to the public or to Apple's competitors through any legitimate means, including but not limited to the SAI misappropriated by Lancaster.

34.     Apple's SAI therefore constitutes trade secrets under both the Defend Trade Secrets Act and California Civil Code § 3426.1 because (1) Apple has taken reasonable measures to keep such information secret, (2) such information is not generally known to the public or to others who can obtain economic value from disclosure or use of the information, and (3) such information derives independent economic value from not being generally known.

## LANCASTER MISAPPROPRIATES APPLE'S TRADE SECRETS IN AN EFFORT TO OBTAIN PERSONAL GAIN

35.     Until November 1, 2019, Lancaster worked as an Advanced Materials Lead and Product Design Architect working on product design for numerous Apple hardware products. Lancaster's role involved evaluating materials and prototyping innovations to enable future generations of products. Because of his senior role and disclosure on multiple projects, Lancaster was granted access to certain SAI.

36.     On November 29, 2018, the Correspondent first contacted Lancaster seeking, on information and belief, SAI. Lancaster and the Correspondent exchanged messages and participated in at least two phone calls.

COMPLAINT

37.     For the remainder of 2018 and into 2019, Lancaster and the Correspondent remained in contact via text messages, email, and telephone.

38.     In Spring 2019, Lancaster expressed to the Correspondent in profane terms his displeasure with Apple. His displeasure, on information and belief, was based on a story published that day that reported a rumor that Apple would produce a new hardware product. Shortly thereafter, Lancaster asked the Correspondent to investigate the substance of that story because "it could mean trouble for my [Lancaster's] startup." The Correspondent replied "I'll see what I can find out."

39.     Less than two weeks later, Lancaster communicated to a third party that the Correspondent had committed to publishing an article about Lancaster's startup if it obtained $1 million in funding. On information and belief, the Correspondent agreed to publish that article in exchange for Lancaster's ongoing misappropriation of Apple trade secrets.

40.     On September 3, 2019, Lancaster met with the Correspondent in person. On information and belief, Lancaster may have disclosed SAI and provided hard copies of documents containing SAI to the Correspondent during this meeting.

41.     On October 7, 2019, Lancaster sent numerous messages to the Correspondent. In those messages, Lancaster stated that he would be giving notice of his departure to Apple on October 15, 2019 and disclosed to the Correspondent trade secret SAI about future Apple hardware products.

42.     In that same text conversation, Lancaster sought further personal gain: he asked the Correspondent if they wanted "to write a story about a 12-year Apple Design Veteran leaving for an amazing startup?" Lancaster also wrote, "We can't publish that the startup is working with Apple…but you could make it blatantly obvious."

43.     The next day, on October 8, 2019, Lancaster sent the Correspondent a photograph of an internal Apple document. The photographed document was marked "CONFIDENTIAL" and constitutes SAI. The Correspondent responded, "Oh I'd like to get that if possible."

COMPLAINT

44.     On October 10, 2019, the Correspondent requested additional confidential information from Lancaster related to another unannounced Apple project referred to herein as "Project X."

45.     On October 15, 2019, Lancaster submitted his resignation to Apple, and he began off-boarding from his roles within the company. Per Apple's policies and Lancaster's contracts with Apple, Lancaster was obliged to return all documents and devices containing SAI to Apple and deliver to Apple all documents and materials of any kind pertaining to his work. But Lancaster violated each of these obligations.

46.     On October 16, 2019, the Correspondent asked Lancaster "can you grab me those docs before you leave"? Lancaster responded "which ones," and the Correspondent then identified specific Apple confidential documents that they wanted Lancaster to misappropriate.

47.     Later that month, Lancaster informed the Correspondent that he intended to attend a meeting regarding Project X.

48.     At least because he had previously given notice of his resignation, Lancaster had no Apple business reason to attend that meeting. In fact, Lancaster had already begun transitioning his Apple responsibilities to other employees before he attended that meeting. Lancaster knew that trade secret SAI regarding Project X would be disclosed in this meeting. On information and belief, Lancaster attended this meeting specifically so that he could obtain the information regarding Project X that the Correspondent had previously asked him to misappropriate.

49.     Prior to the time Lancaster attended the Project X meeting, he was instructed by Apple that he should not attend the meeting, especially given his announced departure. Additional Apple personnel told Lancaster during the meeting that he should not be present. Lancaster eventually left the meeting, but he learned substantial SAI regarding Project X before leaving. Lancaster wrote to one of his managers who had instructed him that he should not be in the meeting that "I had already been exposed to all the hardware they showed while I was in the [meeting]. Was just hoping to see a demo." On information and belief, this communication by

COMPLAINT

Lancaster was intended to disguise his efforts to misappropriate Apple trade secrets regarding Project X.

50.     On information and belief, Lancaster transmitted the trade secret SAI gleaned from this meeting to the Correspondent on the same day the meeting occurred.

51.     On October 24, 2019, Lancaster requested that Apple grant him access to additional SAI related to two other confidential Apple projects. At least because he had given notice of his resignation nine days earlier, Lancaster had no Apple business reason to gain access to this SAI. On information and belief, Lancaster requested this access to download additional confidential Apple documents to send to the Correspondent.

52.     November 1, 2019 was Lancaster's final day of employment at Apple and his credentials to log into the secure Apple corporate network were set to expire at midnight. But at 10:24 p.m. that same day, Lancaster used his credentials to log onto Apple's secure corporate network from a location outside Apple facilities. On information and belief, Lancaster used this access to download additional SAI before his login credentials expired. In particular, Lancaster downloaded confidential information that would assist his new employer.

53.     Mere days after Lancaster's final day at Apple, Lancaster had a call with the Correspondent and later congratulated the Correspondent about the success of an article that disclosed SAI that Lancaster had misappropriated in his final weeks of employment at Apple.

**LANCASTER REMAINS AN ONGOING THREAT OF MISAPPROPRIATION**

54.     The complete scope of the SAI Lancaster misappropriated is currently unknown, and Apple's forensic investigation is ongoing. Apple has already expended significant financial resources investigating Lancaster's misappropriation.

55.     Lancaster's theft of Apple's trade secrets puts Apple at risk of severe harm.

56.     Apple developed the stolen trade secret SAI at great expense and over the course of years' of research, experimentation, and trial and error. Absent an injunction enjoining him from continuing to misappropriate Apple's trade secret information, Lancaster will cause irreparable injury to Apple.

57.     Lancaster currently works for a company that has a vendor service agreement with Apple. This vendor service agreement has its own confidentiality obligations that further prohibit disclosure and misuse of Apple confidential information. As such, Lancaster is subject to the additional, ongoing confidentiality obligations of this vendor service agreement as part of his new role.

58.     Apple therefore seeks the return of any and all copies of its SAI and to ensure that Lancaster no longer possesses such data and information and an injunction against any use of that information.

## FIRST CAUSE OF ACTION

### Violation of Defense of Trade Secret Act

59.     Apple incorporates all of the above paragraphs as though fully set forth herein.

60.     Apple owns and possesses certain confidential and trade secret documents and information as alleged above, including but not limited to trade secret SAI.

61.     Apple's confidential trade secret documents and information relate to products and services used, sold, shipped, and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and/or foreign commerce.

62.     Apple has taken reasonable steps to protect the secrecy of its trade secret documents and information, including its SAI and all of the information and materials Lancaster has misappropriated.

63.     Apple's SAI derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

64.     In violation of Apple's rights, Lancaster misappropriated Apple's SAI in the unlawful manner alleged herein. Lancaster's misappropriation of the confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

65.     Lancaster knew his actions were unauthorized because he was a party to the IPA and participated in multiple SAI trainings that unambiguously stated that work product and

COMPLAINT

information regarding the specific project was to remain secret and undisclosed from any third party or the public.

66.     Lancaster has failed to return to Apple all SAI within his possession, custody, or control, and he has attempted to conceal his theft of such information. Apple is informed and believes and, on that basis, alleges that if Lancaster is not enjoined, he will continue to misappropriate Apple's SAI.

67.     Lancaster's misconduct represents a continuing threat for which Apple has no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, Lancaster will continue to retain and use Apple's trade secret information and as a result Apple will suffer severe and irreparable harm and damage. Under Unites States Code § 1836(b)(3)(A), Apple is entitled to an injunction against the misappropriation and continued threatened misappropriation of trade secrets as alleged herein.

68.     Apple is entitled to recover from Lancaster the damages sustained as a result of the misappropriations alleged herein. The amount of such damages cannot be determined at this time but will be proven at trial. Apple is further entitled to recover from Lancaster the gains, profits, and advantages that Lancaster obtained as a result of the misappropriation alleged herein. Apple is currently unable to ascertain the full extent of these gains, profits, and advantages but will prove the value thereof at trial.

69.     Apple is also entitled to an award of exemplary damages and attorney's fees pursuant to Unites States Code § 1836(b)(3)(B-D) because Lancaster's misappropriation was willful and malicious.

## <u>SECOND CAUSE OF ACTION</u>

**Violation of California Uniform Trade Secret Act, Cal. Civ. Code § 3426 *et seq.***

70.     Apple incorporates all of the above paragraphs as though fully set forth herein.

71.     Apple owns and possesses certain confidential and trade secret documents and information as alleged above, including but not limited to trade secret SAI.

72.     Apple has taken reasonable steps to protect the secrecy of its trade secret documents and information, including its SAI and all of the information and materials Lancaster has misappropriated.

73.     Apple's SAI derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value form the disclosure or use of the information.

74.     In violation of Apple's rights, Lancaster misappropriated Apple's confidential, proprietary, and trade secret SAI in the improper and unlawful manner alleged herein. Lancaster's misappropriation of the confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

75.     Lancaster knew his actions were unauthorized because he was a party to the IPA and participated in multiple SAI trainings that unambiguously stated that work product and information regarding the specific project was to remain secret and undisclosed from any third party or the public.

76.     In violation of Apple's rights, Lancaster misappropriated Apple's confidential, proprietary, and trade secret SAI in the improper and unlawful manner alleged herein. Lancaster's misappropriation of the confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

77.     Apple is entitled to recover from Lancaster the damages sustained as a result of the misappropriations alleged herein. The amount of such damages cannot be determined at this time but will be proven at trial. Apple is further entitled to recover from Lancaster the gains, profits, and advantages that Lancaster obtained as a result of the misappropriation alleged herein. Apple is currently unable to ascertain the full extent of these gains, profits, and advantages but will prove the value thereof at trial.

78.     Lancaster's misconduct constitutes a continuing threat for which Apple has no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, Lancaster will continue to retain and use Apple's trade secret information and as a result Apple will suffer severe and irreparable harm and damage. Under California Civil Code § 3426.2, Apple

is entitled to an injunction against the misappropriation and continued threatened

misappropriation of trade secrets as alleged herein.

79.     The aforementioned acts were willful, fraudulent, and malicious, entitling Apple to

exemplary damages under California Civil Code § 3426.3(c).

80.     Under California Civil Code § 3426.4, Apple is entitled to an award of attorneys'

fees for Lancaster's misappropriation of trade secrets.

**THIRD CAUSE OF ACTION**

**Breach of Written Contract**

81.     Apple incorporates all of the above paragraphs as though fully set forth herein.

82.     The IPA was a valid and existing contract at all times during and after Lancaster's

employment by Apple and imposed binding contractual obligations on Lancaster at all relevant

times and as a condition of Lancaster's employment with Apple.

83.     SAI, as defined herein, qualifies as "Proprietary Information" under the terms of

the IPA.

84.     Apple performed all obligations required of it under its contracts with Lancaster

and at no time were there any outstanding conditions precedent to the required performance of

Lancaster of his contractual obligations to Apple.

85.     Pursuant to the terms of the IPA, Lancaster was obligated to: (1) comply with

Apple policies regarding "Proprietary Information" and "not use or disclose Proprietary

Information without the written consent of Apple"; (2) refrain from activities "competitive with

or directly related to Apple's business or products, or to its actual or demonstrably anticipated

research or development" and "activities that conflict with any employment obligations to

Apple;" and (3) "promptly deliver to Apple all documents and materials of any kind pertaining to

[his] work at Apple" upon the termination of his employment with Apple.

86.     Apple's policies regarding "Proprietary Information," as communicated to

Lancaster during the Business Conduct courses he took and the in-person confidentiality training

specific to the projects about which Lancaster misappropriated SAI, prohibit employees from

1   storing SAI on devices over which they do not have personal control and require Apple

2   employees to store and transmit SAI using only secure mechanisms authorized by Apple.

3         87.     Lancaster breached the IPA when he failed to use his best efforts to safeguard

4   Apple's "Proprietary Information" and violated Apple policies regarding "Proprietary

5   Information." These actions in breach of the IPA include, but are not limited to, Lancaster: (1)

6   downloading Apple "Proprietary Information" and transmitting that information to the

7   Correspondent using various methods; (2) physically removing Apple "Proprietary Information"

8   from Apple facilities without any legitimate business reason; and (3) communicating "Proprietary

9   Information" to the Correspondent.

10        88.     Upon information and belief, Lancaster continues to possess Apple "Proprietary

11  Information" in breach of the IPA, despite the termination of his employment with Apple on

12  November 1, 2019.

13        89.     Upon information and belief, Lancaster improperly took and continues to retain

14  Apple "Proprietary Information" for the purpose of transmitting it to the Correspondent, the

15  media, and Apple's vendors and competitors, in breach of the IPA.

16        90.     Upon information and belief, Lancaster improperly took and continues to retain

17  Apple "Proprietary Information" for the additional purpose of promoting his new employer and a

18  business in which Lancaster is an investor.

19        91.     As a direct and proximate result of Lancaster's breaches of the IPA and

20  Confidential Information Policy, Apple suffered damages including, but not limited to, the costs

21  associated with investigating said breaches.

22        92.     Apple is entitled to recover from Lancaster the damages caused by Lancaster's

23  breaches of the IPA. The amount of such damages cannot be determined at this time but will be

24  proven at trial. Apple is further entitled to recover from Lancaster the gains, profits, and

25  advantages that he obtained as a result of these breaches. Apple is currently unable to ascertain

26  the full extent of these gains, profits, and advantages but will prove the value thereof at trial.

27        93.     Apple is informed and believes that Lancaster is continuing and will continue to

28  breach the IPA. By reason of the ongoing breaches, Apple has and will suffer great and

COMPLAINT

irreparable harm and damage, which harm and damage will be difficult to ascertain, and Apple will be without an adequate remedy at law. As a result, Apple is entitled to an injunction restraining Lancaster from breaching the IPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

1.  Judgment in Apple's favor and against Lancaster on all causes of action alleged herein;

2.  For injunctive relief;

3.  For damages in an amount to be further proven at trial;

4.  For punitive damages;

5.  For restitution;

6.  For costs of suit incurred herein;

7.  For prejudgment interest;

8.  For attorneys' fees and costs; and

9.  For such other and further relief as the Court may deem to be just and proper

## **JURY DEMAND**

Apple demands a jury trial for all issues so triable.


Dated:  March 11, 2021

                                        DAVID R. EBERHART
                                        SHARON M. BUNZEL
                                        ANDREW M. LEVAD
                                        O'MELVENY & MYERS LLP


                                        By:    */s/ David R. Eberhart*
                                        _____
                                               David R. Eberhart
                                               Attorneys for Plaintiff
                                               APPLE INC.